# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### GREENVILLE DIVISION

**CHARLES RAY CRAWFORD**                                                    **PLAINTIFF**

**v.**                                                    **No. 4:12CV38-MPM-SAA**

**CHRISTOPHER EPPS, ET AL.**                                                    **DEFENDANTS**

## MEMORANDUM OPINION

This matter comes before the court on the *pro se* prisoner complaint of Charles Ray Crawford, who challenges the conditions of his confinement under 42 U.S.C. § 1983. For the purposes of the Prison Litigation Reform Act, the court notes that the plaintiff was incarcerated when he filed this suit. The defendants have moved [74] for summary judgment as to four of Crawford's claims; Crawford has responded [84] to the motion, and the defendants have replied [91]. The matter is ripe for resolution. For the reasons set forth below, the defendants' motion [74] for summary judgment will be granted, and judgment will be entered for the defendants as to the plaintiff's claims regarding: (1) due process in the grievance system, (2) retaliation by Lt. Earnest King, (3) retaliation by Warden Earnest Lee, and (4) poor general conditions of confinement arising out of lack of privacy from the view of female prison guards.

## Summary Judgment Standard

Summary judgment is appropriate if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) and (c)(1). "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the

nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Examiners*, 204 F.3d 629,

633 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066

(1988)). After a proper motion for summary judgment is made, the burden shifts to the non-movant to

set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby,* Inc.,

477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Beck*, 204 F.3d at 633; *Allen v.

Rapides Parish School Bd.*, 204 F.3d 619, 621 (5th Cir. 2000); *Ragas v. Tennessee Gas Pipeline

Company*, 136 F.3d 455, 458 (5th Cir. 1998). Substantive law determines what is material. *Anderson*,

477 U.S. at 249. "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment. Factual disputes that are

irrelevant or unnecessary will not be counted." *Id.*, at 248. If the non-movant sets forth specific facts

in support of allegations essential to his claim, a genuine issue is presented. *Celotex*, 477 U.S. at 327.

"Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving

party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587, 89 L. Ed. 2d 538 (1986); *Federal Savings and Loan, Inc. v. Krajl*, 968 F.2d 500, 503 (5th

Cir. 1992). The facts are reviewed drawing all reasonable inferences in favor of the non-moving

party. *Allen*, 204 F.3d at 621; *PYCA Industries, Inc. v. Harrison County Waste Water Management

Dist.*, 177 F.3d 351, 161 (5th Cir. 1999); *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187,

1198 (5th Cir. 1995). However, this is so only when there is "an actual controversy, that is, when both

parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075

(5th Cir. 1994); *see Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998). In the absence of

proof, the court does not "assume that the nonmoving party could or would prove the necessary facts."

*Little*, 37 F.3d at 1075 (emphasis omitted).

**Procedural Posture**

Charles Ray Crawford is an inmate in the custody of the Mississippi Department of Corrections ("MDOC") housed at all times pertinent on Death Row in Unit 29-J of the Mississippi State Penitentiary (MSP). Crawford alleges violations of his Eighth Amendment rights by the Defendants, current and former employees of the Mississippi Department of Corrections. As set forth in the Magistrate Judge's Report and Recommendation [21], approved and adopted by the court on May 19, 2014 [31], Crawford makes two basic claims: (1) poor general conditions of confinement, and (2) retaliation for complaining about them. The Report and Recommendation distilled the allegations of Crawford's lengthy complaint into eighteen constitutional claims:

(1)     The heating and cooling system at Unit 29-J is defective – and was completely broken from December 29, 2011, to January 1, 2012. In the winter, if the temperature on the upper level is adequate, then it is unbearably cold in the lower level – and vice versa. The only "fix" MDOC has attempted is to repeatedly send in maintenance crews to adjust the temperature – rather than address the cause of the temperature differential between the upper and lower levels.

(2)     Hot water is only intermittently available at times other than shower call.

(3)     Rainwater leaks into many of the cells in Unit 29-J (including Crawford's).

(4)     Food is served on unsanitary trays after sitting out long enough to spoil – and has at times caused Crawford nausea, vomiting, and diarrhea. Though this problem was fixed for a time, it has returned.

(5)     Lighting in the cells is inadequate to read – registering only 17 to 18 lumens when measured right against the bulb – even after MDOC installed two fluorescent bulbs in each cell, rather than one. The dual-bulb fixtures produce only 17 to 18 lumens, when 20 is the minimum required for reading.

(6)     For about two months, Crawford was housed near death row inmates James Billiot and Ronnie Conner, both of whom suffer from severe psychosis. Both are loud, hard to control, and dangerous. He received a Rule Violation Report for refusing to move back near Billiot and Conner. He was moved away from them just after the instant suit was filed, but he is now near another mental patient.

(7)     The window screens do not stop biting and stinging insects from entering Crawford's cell and tormenting him, especially at night. He loses sleep and remains exhausted because of

that.  If he closes the window entirely, then his cell temperature in the summer can exceed 100°F, preventing him from sleeping.  MDOC attempted to fix this problem, but the screens they ordered were too small for the window frames.  MDOC has not fixed the problem.

(8)     The laundry service is unreliable and does not adequately clean Crawford's bed linens and clothes.  In addition, sometimes his clothes get lost.  For this reason, Crawford has been laundering his clothes and bedding in his cell – in accordance with MDOC policy for death row inmates.  Unit 29-J inmates can no longer do their own laundry – and must now accept the unreliable and unsatisfactory laundering of the Mississippi State Penitentiary.

(9)     The grievance ("ARP") system is rigged such that death row inmates have no real chance of having a grievance decided in their favor.  Though there are hearings and investigations, they are a sham carried out only to meet the legal requirements established by this court. Inmates are always found guilty with no regard to the evidence presented.  Also, the punishments are completely out of proportion to the offenses (denial of family visitation and phone privileges for up to a year, etc.) for the most minor, non-violent of rule violations.  Crawford, himself, has only been found guilty of five rule infractions:  (1) suicide attempt, (2) making loud noises, or "beating on the tin," (3) threatening a guard, (4) refused to take his meal tray because the food was spoiled, and (5) using a small towel to shield himself from the view of female guards while using the toilet.  He denies threatening the guard and claims that use of the towel briefly for privacy as he did comports with MDOC policy and that he has done so for nearly two decades.

(10)    On May 31, 2011, Lt. Earnest King issued a rule violation report against Crawford for threatening him, an allegation Crawford vehemently denies.  Crawford did, however, tell other death row inmates that King (who routinely works on death row) was part of the "Execution Team" that actually carries out executions for MDOC.  Crawford alleges that two other officers (including the hearing officer) told him that they knew King was lying, but that they "had to ignore that" and find Crawford guilty.  Crawford believes that King retaliated against him for identifying him as an "Execution Team" member.

(11)    On March 7, 2012, Warden Earnest Lee, Lt. Nathan Harris, and others were responsible for Crawford's being sprayed with a chemical agent during his transfer to another cell in the unit.  Crawford believes this was done in retaliation for his filing 18 request forms complaining about living conditions in Unit 29-J.

(12)    Crawford was punished for putting a small hand towel up while he uses the toilet to shield himself from the view of the female officers.  He has done so for 18 years with no problems, but now is being punished for it.  He believes this is also in retaliation for having filed numerous grievances and suits about living conditions in Unit 29-J.

(13)    Death row inmates get no "incentive programs" which offer benefits and privileges for good behavior.

(14)    MDOC charges outrageous prices for canteen items and telephone calls – many times

what the same products and services would cost in the free world.

(15)     Understaffing in the unit and hot-tempered guards cause unsafe conditions in Unit 29-J.

(16)     MDOC does not conduct proper fire drills in Unit 29-J, only "mock" fire drills.

(17)     The American Correctional Association ("ACA") improperly accredited Unit 29-J, when there are many problems that should have prevented accreditation.

(18)     The ACLU failed to ensure that the problems at Unit 32 (which has been shut down) were not repeated in other units.

The court found that numbers (2) intermittently available hot water, (8) inadequate laundry service, (13) lack of death row incentive programs, (14) high prices for canteen items, (16) lack of proper fire drills, (17) improper accreditation by ACA, and (18) failure by ACLU to ensure that problems at Unit 32 were not repeated in other units, were without merit, and those claims were dismissed [31].

The instant motion for summary judgment addresses the merits of some, but not all, of the remaining claims.[1]  The defendants have challenged the merits of Crawford's due process claim (9) that the grievance process is rigged and unfair – as well as his retaliation claims, (10) that Lt. Earnest King issued Plaintiff a false Rule Violation Report in retaliation for Plaintiff telling other inmates that King was on the "Execution Team"), (11) that Warden Earnest Lee, Lt. Nathan Harris and others were responsible for Crawford being maced on March 7, 2012, in retaliation for complaining about living conditions on death row, and (12) that Crawford is being punished for putting a towel or sheet up on the bars of his cell while he uses the toilet in retaliation for complaining about living conditions on death row.

---

[1]The defendants' motion for summary judgment and supporting memorandum does not address the merits of Crawford's claims related to the housing conditions on death row – numbers (1) heating and cooling system problems, (3) rainwater leaks, (4) inadequate food service, (5) inadequate lighting in cells, (6) housing near severely mentally ill inmates, (7) window screens inadequate to stop biting insects, and (15) death row is understaffing and hot-tempered guards causing unsafe conditions.

## Undisputed Material Facts

For the purposes of the instant motion for summary judgment, the court will take the facts set forth below as true.

## Rigged Grievance Process

Crawford alleges that the prison grievance process is rigged such that death row inmates have no chance of having a grievance decided in their favor [21 at 2]. Crawford alleges that there are hearings and investigations, but they are a sham carried out only to meet the legal requirements established by the court. *Id.* As examples, Crawford alleges that Lt. James Griffin was the investigating officer on a Rule Violation Report (RVR) alleging that Crawford threatened Lt. Earnest King; Lt. Eddie Cates was the hearing officer on the subject RVR [1 at 16]. Crawford alleges that both Griffin and Cates admitted that they knew King had issued a false RVR, but went along with it because they feared for their jobs [1 at 16]. Crawford also alleges that Lt. Sarah Pittman was "the Disciplinary hearing officer over my last RVR [1 at 16]. Crawford alleges that Pittman's hearing was biased. *Id.* In addition, inmate Roger Gillett states that he, too, has been told that he had to be found guilty because the RVR crossed the warden's desk. (Ex. 5). Finally, inmate Timothy Ronk states that he has also been found guilty of an RVR, even when two guards testified on his behalf. (Ex. 7).

### Retaliation for Spreading Rumor that Lt. Earnest King was on "Execution Team"

On May 31, 2011, Lt. Earnest King issued a Rule Violation Report ("RVR") against Crawford for threatening him, an allegation that Crawford denies. Ex. 1 to Plaintiff's Response. Crawford alleges that King wrote him the RVR in retaliation for telling other Death Row inmates that King was on the "Execution Team" – the group of correctional officers responsible for carrying out the execution of death row inmates [21 at 3]. Defendants' Ex. A at Crawford 2.

**March 7, 2012, Mace Incident**

Crawford alleges that on March 7, 2012, Warden Earnest Lee, Lt. Nathan Harris and others were responsible for his being sprayed with mace during his transfer to another cell in the unit [21 at 3].  Crawford believes that he was sprayed with mace in retaliation for his complaining about living conditions on death row. *Id.*  According to Crawford, he began making written and verbal complaints to Lt. Nathan Harris regarding, *inter alia*, "the living conditions on Unit 29-J, and the lack of a fair disciplinary process."  Ex. 1; Ex. 6 to Plaintiff's Response.  On March 2, 2012, Crawford and Earnest Lee "had a conversation regarding the inappropriate temperatures in Unit 29-J caused by the heating system.  Lt. Lee and I were unable to agree on whether the temperatures were inappropriate, so I told him that he would be hearing from me on paper."  Ex. 1 to Plaintiff's Response.  Crawford then made a written complaint "about the inappropriate temperatures in the building being caused by the heating system."  Ex. 1; Ex. 9 to Plaintiff's Response.  Crawford "also made two written complaints about the unfairness of the disciplinary process on that date."  Ex. 1; Ex. 9 to Plaintiff's Response.  On March 6, 2012, Crawford "again made a written complaint to Lt. Nathan Harris about the unfairness of the disciplinary process."  *Id.*

On March 7, 2012, a tier officer came to Crawford's cell and was told that he was being moved to B-Zone, which is where the severely mentally ill inmates are housed.  Ex. 1; Ex. 2; Ex. 6 to Plaintiff's Response.  According to inmate Marlon Howell, who had a direct view of Crawford's cell, Crawford asked why he was being moved, and the guard said that he was just following orders.  Ex. 2 to Plaintiff's Response.   Crawford asked several officers throughout the day why he was being moved and who gave him the order to be moved, but the officers did not answer his questions.  Ex. 1; Ex. 2; Ex. 6 to Plaintiff's Response.   Crawford informed the officers that he would not willingly move to B-Zone because that is where the severely mentally ill inmates are housed – and because he believed that

Nathan Harris and Earnest Lee were moving him in retaliation for filing complaints about the living conditions on Unit 29-J. *Id.*

At some point that day, a takedown team, accompanied by Capt. Lee Simon and Lt. Morris, went to Crawford's cell and asked him if he was ready to move. Ex. 1; Ex. 2; Ex. 6 to Plaintiff's Response. Crawford again asked why he was being moved. *Id.* This time, Crawford was told that they were just following orders, and if he would not voluntarily move, he would be moved by force. *Id.* Mr. Crawford asked them if they were aware of the rulings in the *Russell v. Johnson* and *Presley v. Epps* lawsuits that severely mentally ill inmates had to be housed separately from the other inmates. *Id.*

Crawford then informed them that he was not refusing to move and he would not resist them in any way – and that his rights were being violated. Ex. 1; Ex. 2; Ex. 6 to Plaintiff's Response. Though Crawford then got down on his knees with his back to the door, crossed his legs and put his hands behind his back, he did not go to his cell door to be restrained, as ordered. Ex. 1; Ex. 2 to Plaintiff's Response. Capt. Lee Simon then sprayed Crawford on the back of his head, the back of his neck, and his back with ome sort of chemical agent used to subdue inmates. Ex. 1; Ex. 2; Ex. 6 to Plaintiff's Response. The takedown team then rushed into Crawford's cell and put him facedown on the floor. Ex. 1; Ex. 2 to Plaintiff's Response. He was then shackled, picked up by several officers, and physically moved to B-Zone. Ex. 1; Ex. 2; Ex. to Plaintiff's Response.

According to inmate Tom Loden, who is housed on B-Zone, he saw Crawford being carried onto the B-Zone tier by the guards. Ex. 3 to Plaintiff's Response. The guards were wearing gas masks, and it "was obvious from both sight and smell, Charles had been sprayed heavily with some type of chemical agent." *Id.* Mr. Loden also observed "several areas on him that were orange in color, a clear indicator of chemical use." *Id.* Additionally, "within seconds, the scent of pepper

spray/chemical agent overwhelmed the entire tier." *Id.* "Even the officers in gas masks were coughing and wheezing." *Id.* At no time did Loden observe Crawford physically resisting the officers. *Id.* He also did not see any decontamination by the officers of Mr. Crawford after the use of the chemical agents. *Id.* Within a couple of days after he had been moved to B-Zone, Lt. Nathan Harris came to Mr. Crawford's cell on B-Zone and gave him "a stack of responses to my written complaints, and told me something to the effect that 'now you have your response.'" Ex. 1 to Plaintiff's Response.

As a result of being sprayed with the chemical agent, Crawford suffered burning of his skin, and he developed areas similar to severe sunburn where he was sprayed; the rash lasted two days . *Ex. 1 to Plaintiff's Response.* The chemical agent also got onto his personal belongings, and as a result, he experienced the effects of it even after the effects of being directly sprayed wore off. *Id.* Crawford suffered a seizure the following day, which he attributes to being sprayed with mace.

Crawford was housed on B-Zone from March 7, 2012 through May 3, 2012. Ex. 1; Ex. 8 to Plaintiff's Response. During that time, Crawford was housed near severely mentally ill inmates who made noise during all hours of the day and night, severely affecting his ability to sleep. Ex. 1; Ex. 3 to Plaintiff's Response. On April 26, 2012, Crawford gave "the Complaint in this lawsuit to Mr. Pennington with the Inmate Legal Assistance Program to mail out for filing with the Court." Ex. 1; see also Certificate of Service to Complaint [1]. Later that day, Crawford's case manager wrote him and asked if he would be willing to move back to A-Zone away from the mentally ill inmates if he was given the opportunity. Ex. 1; Ex. 10 to Plaintiff's Response. Crawford agreed to move back to A-Zone, and he was transferred there on May 3, 2012. Ex. 1; Ex. 8 to Plaintiff's Response.

However, when Crawford was moved back to A-Zone on May 3, 2012, he was not moved back to the same cell he occupied on A-Zone before he was moved to B-Zone. *Id.* Instead he was

housed for over fifty days next to an inmate who would "holler, yell, make all kinds of noise at all times of the day and night, and he would also throw feces and urine." Ex. 1 to Plaintiff's Response. He was also near another inmate "who would not flush his toilet or clean his cell for long periods of time which would cause the stench to become unbearable." *Id.* Finally, Crawford was moved back to the cell he occupied before he was moved to B-Zone. Ex. 1; Ex. 8 to Plaintiff's Response.

### Initial Matters

The court will discuss two overarching matters before reaching the merits of Crawford's individual claims: Adding defendant Lt. Earnest King and noting that only nominal damages are available in this case.

### Adding Defendant Lt. Earnest King,
### Who Was Inadvertently Omitted from the Complaint

Crawford inadvertently failed to name Lt. King as a defendant in this case. Crawford was proceeding *pro se* at the time he filed the complaint, and it is clear that he intended to include Lt. King as a defendant. A "pro se plaintiff who makes a pleading gaffe in a complaint deserves an opportunity to offer a curative amendment before the complaint is dismissed with prejudice." *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012). As such, Crawford will be allowed to amend his complaint to name Lt. King as a defendant in both his official and individual capacities.

### Physical Injury Required to Recover Mental or Emotional Damages

A *pro se* prisoner plaintiff in a case filed under 42 U.S.C. § 1983 must allege more than *de minimis* physical injury to state a claim for psychological or emotional damages – regardless of the nature of the claim. *Geiger v. Jowers*, 404 F.3d 371 (5th Cir. 2005), 42 U.S.C. § 1997e(e). In all of Crawford's claims, the only physical injuries he describes are a sunburn-like rash lasting two days (from being sprayed with a chemical agent) – and a seizure he attributes to the chemical agent spray. In § 1983 cases alleging injury or death, expert testimony establishing medical causation is necessary

in all but the most simple and routine cases. *Campbell v. McMillan*, 83 F.Supp.2d 761, 766 (S.D. Miss. 2000); *Johnson v. Arkema, Inc.*, 685 F.3d 452 (5th Cir. 2012)(expert testimony required to provide causal link between chemical exposure and lung disease); *Savage v. Pilot Travel Centers, LLC*, 2011 WL 2135682 (S.D. Miss.) ("[W]ith injuries that are medically complicated . . . expert testimony is required to prove causation."); *Welford v. Thomley*, 2012 WL 3264555 (S.D. Miss.) Determining whether Crawford's seizure was caused by the chemical agent is, without question, medically complicated – especially given Crawford's extensive history of seizures. As Crawford does not have a medical expert witness, he will be unable to present proof of his allegation that the chemical agent caused his seizure, and the court thus cannot consider the seizure as a physical injury arising out of the defendants' actions in this case.

In addition, the court finds that a sunburn-like rash lasting two days is a *de minimis* injury, as, in a similar case, an inmate alleged that he suffered "a sore, bruised ear lasting for three days," and the Fifth Circuit Court of Appeals found that injury to be *de minimis*. *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997). For these reasons, Crawford cannot recover compensatory damages in this case. He cannot recover compensatory damages for his physical injuries, as they are, at most, *de minimis*. In addition, under 42 U.S.C. § 1997e(e), Crawford may not recover compensatory damages for psychological or emotional damages because he cannot prove more than *de minimis* injury. Thus, the only damages available to him in this case are nominal damages – which are awarded for the violation of a legal right where the extent of the loss is not shown or is not significant. Black's Law Dictionary (8th ed. 2004). Though not fixed by law, one dollar is a common award for nominal damages.

## No Money Damages Available as to Claims Against
## the Defendants in Their Official Capacities

The plaintiff acknowledges that no money damages can be awarded against the defendants in their official capacities; however, the court may award prospective injunctive relief based upon official capacity claims.

## Due Process:  Rigged Grievance System

Crawford alleges that the prison grievance system is unfair and rigged against the inmates [21 at 2].  Crawford's claims regarding the prison grievance process are without merit as inmates have no constitutional right to a grievance process or to have their grievances decided in their favor.  *See, e.g., Geiger v. Jowers*, 404 F.3d 371, 374-75 (5th Cir. 2005); *Taylor v. Cockrell*, 2004 WL 287339 (5th Cir.Feb. 12, 2004).  The failure by prison officials to address, investigate or remedy grievances does not violate the Constitution.  *Id.*  In addition, the punishment Crawford faced from the guilty findings, temporary loss of the privilege of buying items from the prison canteen, is not severe enough to trigger due process protections.  *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995).  This punishment does not represent "the type of aytpical, significant deprivation in which a State might conceivably create a liberty interest," a requirement for the punishment to rise to a level sufficient to state a claim of constitutional magnitude.  *Sandin*, 515 U.S. at 486 (1995).  Crawford's claims regarding an unfair grievance system will, therefore, be denied.

## Insufficient Evidence of Retaliation

Prison officials may not retaliate against prisoners for exercising their constitutional rights. *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006).  On the other hand, courts must view such claims with skepticism to keep from getting bogged down in every act of discipline prison officials impose. *Id.*  The elements of a claim under a retaliation theory are:  (1) the plaintiff's invocation of "a specific constitutional right," (2) the defendant's intent to retaliate against the plaintiff for his or her exercise of

that right, (3) a retaliatory adverse act, and (4) causation, *i.e.*, "but for the retaliatory motive the complained of incident . . . would not have occurred." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir.1995) (citations omitted ), *cert. denied*, 516 U.S. 1084, 116 S. Ct. 800, 133 L. Ed. 2d 747 (1996). A prisoner seeking to establish a retaliation claim must also show that the prison official's conduct was sufficiently adverse so that it would be capable of deterring a person of ordinary firmness from exercising his constitutional rights in the future. *Winding v. Grimes*, 4:08CV99-FKB, 2010 WL 706515 at 3 (S.D. Miss. Feb. 22, 2010); *citing Morris v. Powell*, 449 F.3d 682, 684–85 (5th Cir. 2006) at 685. A single incident involving a minor sanction is insufficient to prove retaliation. *Davis v. Kelly*, 2:10CV271-KS-MTP (citing *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999), 2:10CV271-KS-MTP, 2012 WL 3544865 *Id.*). Similarly, inconsequential (*de minimis*) acts by prison officials do not give rise to an actionable retaliation claim. *See Morris* at 685.

In this case, Crawford must prove that he engaged in constitutionally protected activity (seeking redress for grievances), faced significant adverse consequences, and that such action was taken "in an effort to chill [his] access to the courts or to punish [him]for having brought suit." *Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1296 (5th Cir.), *cert. denied*, 513 U.S. 926, 115 S. Ct. 312, 130 L. Ed. 2d 275 (1994); *see also Serio v. Members of Louisiana State Board of Pardons*, 821 F.2d 1112, 1114 (5th Cir.1987). The showing in such cases must be more than the prisoner's "personal belief that he is the victim of retaliation." *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995). *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997).

The Fifth Circuit has made clear the dangers of permitting retaliation claims to proceed in the absence of factual allegations to support an inference of a retaliatory motive. In *Whittington v. Lynaugh*, 842 F.2d 818, 819 (5th Cir. 1988), the plaintiff, Daniel Johnson, had filed numerous lawsuits against administrators and staff within the Texas prison system. The defendants then

denied Johnson's request to have his custody status upgraded, and Johnson alleged that the denial was in retaliation for filing his previous suits. *Id.* Johnson relied solely upon the fact that the denial of his request to upgrade his custody status occurred after he had filed the lawsuits. *Id.* The Fifth Circuit rejected Johnson's claim – and explained why courts must insist upon specific factual allegations to support an inference of retaliation:

> If we were to hold that [Johnson] by his allegations in this case had established a case which was entitled to the full panoply of discovery, appointment of counsel, jury trial and the like, we would be establishing a proposition that would play havoc with every penal system in the country. Prison administrators must classify and move prisoners [and punish them for rule violations]. It is a virtual truism that any prisoner who is the subject of an administrative decision that he does not like feels that he is being discriminated against for one reason or another, such as the past filing of a grievance, a complaint about food or a cellmate, or a prior complaint that he was not being treated equally with other prisoners. If we were to uphold the further pursuit of [Johnson's] complaint in this case we would be opening the door to every disgruntled prisoner denied the next level of trustyship, reassigned to another prison job, moved to another cell, [or] claiming his shoes were uncomfortable, to bring such a suit.

*Whittington v. Lynaugh*, 842 F.2d 818, 819 (5th Cir. 1988). Prisoners routinely file grievances against prison staff on an ongoing basis, for any number of reasons; for example, at Crawford's *Spears* hearing, he acknowledged that he had filed approximately twenty complaints in three weeks' time (about one per day). With such rapid and ongoing complaints, it is not uncommon for a prisoner to file a grievance, then receive an unrelated Rule Violation Report sometime thereafter. Thus, to avoid turning nearly every charge of prison rule violations against a prisoner into a claim of retaliation, courts insist upon additional allegations or evidence to substantiate a retaliation claim – such as prison staff issuing threats of disciplinary action if an inmate files further grievances, staff members randomly pulling an inmate aside to threaten him, members of prison staff perpetrating unprovoked acts of violence against an inmate, or prison staff members wholly fabricating charges of prison rule violations against an inmate. *See Decker v. McDonald*,

2010 WL 1424322 (E.D. Tex. 2010) (Magistrate Judge's Report and Recommendation) (unpublished), adopted by the District Court, 2010 WL 1424292 (E.D. Tex.) (unpublished). As set forth below, no such allegations or evidence are present in the instant case.

### Retaliation:  Lt. Earnest King

On May 31, 2011, Lt. Earnest King issued a rule violation report against Crawford for threatening him, an allegation Crawford denies, as set forth above.  Crawford believes that King charged him with a prison rule violation because Crawford spread the rumor to other Death Row inmates that King was a member of the "Execution Team," the group of correctional officers responsible for executing death row inmates [21 at 3].  Lt. King issued a Rule Violation Report Crawford report on May 31, 2011, charging Crawford with threatening him; Crawford was punished after a disciplinary hearing before James Griffin on June 9, 2011, with a loss of 30 days canteen privileges [74-1 at 2].  When prison staff arrived at Crawford's cell to move him, he refused to leave, and Corrections Officer Terry Gallion, after an order from Commander Richard Armstrong, sprayed Crawford with mace to gain his compliance.  Lt. King was not present when Crawford was sprayed with mace and took no part in the decision to do so.  Crawford, on the order of Commander Armstrong, was then moved to the management isolation cell for six days after the incident on May 31, 2011, [74-1 at 13].

Whether true or not, Crawford's statement that Lt. King was a member of the "Execution Team" would tend to substantially elevate the risk of violence on Death Row – as any inmate there would naturally harbor hatred and animosity toward a person who would participate in the inmate's ultimate demise.  Indeed, for this reason, spreading such a rumor could, itself, act as a threat to Lt. King, who would be the natural target for violence at the hands of the Death Row inmates with that knowledge.  A prison may limit First Amendment rights of inmates if the expression has the potential

for inciting violence. *Adams v. Gunnell*, 729 F.2d 362, 367-68 (5th Cir.1984). Passing this information to other inmates would undoubtedly do so, and the court holds that Crawford's statements – which could only have been made with the intent to expose Lt. King to risk of attack – were not protected under the First Amendment. As Crawford did not invoke a specific constitutional right, he did not meet the first element for a retaliation claim, and the motion by the defendants for summary judgment on this issue will be granted.

### Retaliation: Warden Earnest Lee

Crawford alleges that he complained about the living conditions on death row on multiple occasions – then on March 7, 2012, was sprayed with mace, knocked down and dragged out of his cell despite being on his knees in his cell with his legs crossed and with his hands behind his back. However, prison documents show – and Crawford confirms – that he refused to obey the lawful orders of prison personnel to exit his cell to be transferred. The court has found no evidence that Warden Lee was even present during the incident, and there is no indication that Warden Lee knew of the transfer or when it would occur. In addition, there is no allegation that Warden Lee knew that Crawford would refuse to follow procedure (to approach his cell door to be restrained) – a decision that ultimately led to the use of mace.

Prison staff ordered Crawford to come to his cell door to be restrained before transfer (standard procedure during prisoner transfer for the safety of the guards and other inmates.) Crawford, however, refused to do so – and, instead, demanded to know why he was being moved. Crawford concedes that he repeatedly refused to comply with the order, each time demanding to know why he was being moved. Even assuming that Crawford eventually knelt with his legs crossed and his hands behind his back, he was nonetheless disobeying that direct order. Had he complied with the order, he would simply have been restrained and moved without incident.

The guards had been ordered to move Crawford to a new location. Given his refusal to follow standard safety procedure, the guards were left with two options to accomplish that goal: (1) bring in a take-down team to remove him forcibly from his cell, or (2) use mace to make the cell unpleasant enough to convince Crawford submit to being restrained. Using the take-down team without first applying chemical agent would have greatly elevated the risk of bodily harm to both the officers entering Crawford's cell – and to Crawford, himself. Having presided over many *pro se* prisoner cases involving such encounters, the court is aware that injuries to both guards and inmates are common during takedown. The court gives little consideration to Crawford's contention that he told the officers that he posed no threat – and knelt with his back to the corrections officers. Crawford is confined in Unit 29 – the Mississippi State Penitentiary unit with the highest level of security. Prison guards in maximum security units must exercise utmost caution in dealing with the inmates there. In Crawford's case, the officers could not have known whether his statement was true – or whether he planned to assault them as soon as they entered his cell. The officers chose, instead, to use the chemical agent, a common non-lethal method for gaining the compliance of unruly, uncooperative inmates. The chemical agent worked, and Crawford was removed safely from his cell.

Crawford has not shown that Warden Lee was present during the incident – or was aware that Crawford was being moved at that time. In addition, given Crawford's refusal to obey orders – and the potential for danger that refusal posed – the on-scene guards' decision to use mace was reasonable. *See Baldwin v. Stadler, et al.*, 137 F.3d 836 (5th Cir.1998) (the use of mace on inmates who refuse to comply with an order is constitutional). By the facts set forth above (which Crawford concedes), he gave the transfer officers plenty of reason to use force to remove him from his cell. As such, Crawford has not shown that the use of chemical agent would not have occurred "but for the retaliatory motive," and this retaliation claim will be dismissed. *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir.1998).

Crawford also believes that his transfer to Unit 29-B after this incident was done in retaliation for his complaints regarding the conditions on Death Row. According to Crawford, Unit 29-B housed severely mentally ill inmates. Crawford stayed in B-zone for two months and alleges that some of the inmates were loud enough to disrupt his sleep. First, inmates have no constitutional right to serve their sentence in a particular cell, zone or prison. *Meacham v. Fano*, 427 U.S. 215 (1976); *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995). An inmate has no constitutional right to serve a sentence in a particular institution, to be transferred from one facility to another, or to remain in his chosen facility. *Olim v. Wakinekona*, 461 U.S. 238, 249-50 (1983).

Further, as the defendants have noted, Crawford's allegations tend to show that the conditions in B-Zone (Crawford's destination) were actually *better* than those in A-Zone (his original unit). A-zone certainly appears worse because the inmates were not only loud and disruptive, but filthy and putrid-smelling, as well. Crawford alleges that on B-Zone "[s]ome of the severely mentally ill inmates there made all sorts of noise during the day and night, severely affecting his ability to sleep;" however, on A-Zone, "he was housed near inmates who yelled, hollered, made all sorts of noise, and did not flush their toilets or clean their cells which caused the stench to become unbearable." [85 at 9-10]. Thus, according to Crawford's representations to the court, though the mentally ill inmates were loud and obnoxious on B-zone, the inmates in A-zone were also loud and disruptive – *and* refused to flush their toilets or clean their cells for long periods of time – which caused other inmates (including Crawford) to endure a horrible stench. The decision to move Crawford to an equivalent or better place (B-Zone) does not support his claim that Warden Lee moved him in retaliation for filing grievances. Likewise, prison administrators transfer inmates frequently, and Crawford's housing record reveals that he had been transferred within Unit 32 and Unit 29 nineteen times between December 3, 2003, and March 7, 2012 – about every six months [84-8 at 1]. In addition, Crawford

alleges that Lt. Harris delivered a stack of written responses Crawford's complaints and told him "now you have your response." [85 at 9]. This statement of fact does not constitute proof of retaliation.

Also, as set forth in the discussion of the previous retaliation claim, Crawford has only his personal belief that he was transferred in retaliation for his filing of grievances. He states only that the transfer occurred after he filed the grievances, but does not allege or prove any other facts to support his belief. Under the Fifth Circuit's holding in *Whittington v. Lynaugh*, 842 F.2d 818, 819 (5th Cir. 1988), the mere fact that the transfer occurred after Crawford filed his grievance, without more, is insufficient to state a claim for retaliation.

Finally, Crawford alleges that, after he filed the present Complaint, his case manager offered to move him back to A-zone. Crawford believes that the offer to move him stands as proof of retaliation. However, he does not allege that he was offered a transfer in exchange for dismissing his case – only that he was offered the chance to transfer back to A-zone. These facts do not support a chronology of retaliation. Crawford's exhibit shows that Case Manager Cotton (who is not named as a defendant) offered him the transfer [84-10]. Further, an unconditional offer to return Crawford to his preferred housing unit does not evince a motive of retaliation.

In sum, Crawford has shown only his personal belief that he has suffered retaliation at the hands of the defendants because he filed grievances. The chronology he offers, without more, does not support his retaliation claim. Given the number and frequency of Crawford's grievances, if the court were to entertain Crawford's chronology alone as proof of retaliation, then Crawford could make a *prima facie* case for retaliation for each time he was moved or subjected to discipline. This the very danger the Fifth Circuit warned against in *Whittington v. Lynaugh, supra*.

As the chronology alone is insufficient to establish Earnest Lee's intent to retaliate, there is no proof of record that Crawford's move on March 7, 2012, was an attempt to retaliate against him for

filing grievances or the instant lawsuit regarding the conditions on Death Row. Crawford's allegations establish that A-Zone (where he was initially housed) was objectively worse than B-Zone (where he was transferred); his housing record shows that he was moved from cell to cell on a routine basis throughout his time at the Penitentiary, not just on March 7, 2012, and the offer to move him back to his preferred location does not evince the intent to retaliate. In addition, Crawford has offered only his personal belief that he was the victim of retaliation – which is insufficient to sustain a retaliation claim. Crawford's claim of retaliation against Warden Earnest Lee will thus be dismissed.

**General Conditions of Confinement:**
**Lack of Privacy from the View of Female Prison Guards**

Crawford also complains about being punished for using a towel to block the view of female guards while he used the toilet. The court and the defendants interpreted the claim as one for retaliation; however, in his response to the motion for summary judgment, Crawford states that he meant for the allegations to be a claim regarding the general conditions of his confinement. In addition, he argues that, as the defendants interpreted the claim in a different light than Crawford, himself, the issue is not properly before the court on summary judgment. Crawford is mistaken in this regard, as the facts regarding the claim are before the court, and the defendants have addressed them. As discussed below, this claim fails, even when viewed from as a claim regarding the general conditions of Crawford's confinement.

"[T]he Eighth Amendment may afford protection against conditions of confinement which constitute health threats but not against those which cause mere discomfort or inconvenience." *Wilson v. Lynaugh*, 878 F.2d 846, 849 (5th Cir.1989), *cert. denied*, 493 U.S. 969 (1989)(citation omitted). "Inmates cannot expect the amenities, conveniences, and services of a good hotel." *Id.* at 849 n.5 (citation omitted). Prison officials have certain duties under the Eighth Amendment, but these duties are only to provide prisoners with "humane conditions of confinement," including "adequate food,

clothing, shelter, and medical care . . . ." *Woods v. Edwards*, 51 F.3d 577, 581 n.10 (5th Cir. 1995) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Taking into account the "totality of the circumstances," *McCord v. Maggio*, 910 F.2d 1248 (5th Cir. 1990), the instant claims do not rise to the level of a constitutional violation. The plaintiff has not identified any "basic human need" which he was denied for an unreasonable period of time. *See Woods*, 51 F.3d at 581. In addition, the Fifth Circuit has already ruled on this issue and held that allowing female officers to be present, even during a strip-search of male inmates, does not violate the inmates' constitutional rights. *Oliver v. Scott*, 276 F.3d 736, 746 (5th Cir. 2002); *Letcher v. Turner*, 968 F.2d 508, 510 (5th Cir. 1992). This issue is without merit and will be dismissed.

## Conclusion

For the reasons set forth above, none of the plaintiff's claims at issue in the instant motion for summary judgment have merit; the defendants' motion [74] will be granted, and judgment will be entered for the defendants as to these claim. In addition, Lt. Earnest King will be added as a defendant. Finally, the only damages available to the plaintiff in the present case are nominal damages. A judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this, the 4th day of September, 2015.

**/s/ MICHAEL P. MILLS**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**